T.C. Summary Opinion 2010-166


UNITED STATES TAX COURT


AIDA B. ABIOG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14886-09S.                    Filed November 2, 2010.


<u>Caroline DeLisle Ciraolo</u>, for petitioner.

<u>Tyler N. Orlowski</u>, for respondent.


GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code (Code) in

effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies in petitioner's 2005, 2006, and 2007 Federal income taxes of $2,406, $8,464, and $388 and section 6662(a) accuracy-related penalties for each year of $481, $1,693, and $78, respectively. After concessions,[1] the issues for decision are: (1) Whether petitioner's salary for 2005, 2006, and a portion of 2007 from the Baltimore, Maryland, City Public Schools (BCPS) is exempt from Federal income tax under the Convention With Respect to Taxes on Income, U.S.-Phil., art. 21, Oct. 1, 1976, 34 U.S.T. 1277 (article 21); (2) whether petitioner is entitled to deduct certain employment, living, transportation, and medical expenses that she claimed for 2005 and 2006; and (3) whether petitioner is liable for the accuracy-related penalty under section 6662(a) for the 3 years at issue.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Maryland when she filed her petition.

---

[1]Respondent also determined that petitioner did not include State income tax refunds and interest income in her gross income for 2006 and 2007. Petitioner did not address these issues at trial; therefore, the issues are deemed conceded. See Rule 149(b).

Petitioner is a citizen of the Republic of the Philippines. She received a bachelor's degree in elementary education and a master's degree in educational administration, both from a university in the Philippines.[2]  Petitioner has taught since 1997 and was a sixth grade teacher for the Sofronio Espanala District in Palawan, Philippines, from 2002 until she left the Philippines in 2005.  Petitioner entered the United States on June 22, 2005, arriving in Baltimore to teach for BCPS as part of an international teaching exchange program sponsored by the U.S. Department of State (the State Department).

Amity Institute (Amity) is a nonprofit organization the State Department approved to operate an exchange teacher program. The exchange teacher program allows qualified foreign teachers to enter the United States to teach for up to 3 years.  Amity does not directly recruit teachers from the Philippines.  During 2004 and 2005 Amity worked with Badilla Corp. (Badilla), a business entity from the Philippines, and with Avenida & Associates, Inc. (Avenida), a business entity from the United States.  Badilla and Avenida are affiliated entities, and they worked together to facilitate the placement of qualified Filipino teachers in American schools.  Badilla collected background information such

---

[2]In petitioner's affidavit attached to her opposition to respondent's motion for partial summary judgment (the affidavit), petitioner states that she received her degrees from Palawan University.  At trial, petitioner testified that she received her degrees from Cagayan State University.

as transcripts and résumés from teachers in the Philippines who were interested in the exchange teacher program in the United States. Badilla found its prospective Filipino teachers principally by word of mouth and seminars conducted by its executives. Avenida or Badilla charged placement fees and additional charges to help teaching candidates with, among other tasks, finding employers in the United States and obtaining visas. In the United States, Avenida helped school districts find promising teaching candidates by providing access to a database of overseas jobseekers.

In late 2004 petitioner attended an orientation session for an exchange teacher program Badilla sponsored. She ultimately submitted her transcript and résumé to Badilla. BCPS worked with Avenida to receive access to a preselected list of qualified Filipino teachers. This was the first time BCPS had recruited teachers from the Philippines. From the preselected teachers BCPS administrators chose the candidates the school system wanted to interview. In January 2005 George Duque, manager of recruitment and staffing for BCPS, traveled to the Philippines to interview petitioner and other teaching candidates. Shortly afterwards Badilla informed petitioner that BCPS would be offering her employment for the 2005-2006 school year. Petitioner received a letter from BCPS dated January 6, 2005, officially offering her employment for the 2005-2006 school year.

Generally, foreign teachers who want to teach in the United States may obtain one of two types of visas. One is the H-1B visa for working professionals. The second is the J-1 visa for individuals coming to the United States under a cultural exchange program approved by the State Department. The J-1 visa is more convenient for foreign individuals who are new teachers in the United States because the visa timing coincides with the academic year in the United States. Petitioner paid Avenida $5,200 for the following fees: A $3,200 placement fee, a $725 U.S. documentation fee, a $500 J-1 visa processing fee, and $775 for airfare and travel.

Amity sponsored petitioner's J-1 visa. The State Department authorized Amity to issue Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status. The form identifies the visitor; identifies the visa sponsor; briefly describes the exchange program, including the start and end dates; identifies the category of exchange; and states the estimated cost of the exchange program. The exchange teacher program cost $3,000. At all relevant times, Gertrude Hermann was Amity's executive director.

An Amity representative explained to petitioner that if she accepted the teaching offer, BCPS would be evaluating her performance throughout the school year. If her performance was

satisfactory, BCPS would continue her employment for the following school year.

In a letter to petitioner dated April 11, 2005, Amity confirmed BCPS' offer. On April 19, 2005, petitioner signed an Amity exchange teacher contract with Amity and BCPS. Amity prepared a Form DS-2019 for petitioner's signature and mailed it to her. The length of time listed on the Form DS-2019 for petitioner's visa was 3 years, the same length of time as the exchange teacher program. Petitioner signed the form and returned it to Amity for processing.

Petitioner took three courses as prerequisites to teach for BCPS. She also requested and received a 1-year leave of absence from her teaching position in the Philippines, for the period June 15, 2005, through June 14, 2006. Petitioner did not request a second leave of absence. Petitioner arrived in Baltimore on June 22, 2005. On June 30, 2005, petitioner signed a "3 months with option to extend" lease for an apartment at The Belvedere Towers Apartments. Petitioner exercised the option and resided in that apartment until July 31, 2006. She signed a 1-year lease on August 2, 2006, for a different apartment in the same apartment building. At all relevant times, petitioner owned property in the Philippines.

During the years at issue up to the time of trial, petitioner was married and had three children. In an email to

Amity dated July 8, 2005, petitioner inquired into the process for bringing her family to the United States. She was informed that teachers participating in the exchange teacher program could not bring family to the United States until the teachers received a satisfactory evaluation from their schools. Thus, petitioner's first opportunity to bring her family to the United States would be after she completed her first year of teaching for BCPS. Petitioner's family came to the United States in August 2006 and moved into the new apartment, with petitioner, that she leased on August 2, 2006. Her husband requested and received two leaves of absence from his employer in the Philippines. The first, for the period November 14, 2006,[3] through December 7, 2007, lists "vacation" as the reason for the request. The second, for the period December 5, 2007, through February 26, 2008, lists "sick" as the reason for the request. Petitioner and her husband purchased a single-family home in Baltimore in 2009.

On August 10, 2005, petitioner signed a standard Provisional Contract for Conditional or Resident Teacher Certificate Holders (BCPS employment contract), effective beginning August 24, 2005. The BCPS employment contract was for 1 year, terminating at the end of the 2005-2006 school year. It is the only contract that petitioner signed with BCPS. All first-year teachers who did not

---

[3]No explanation was provided for why petitioner's husband's leave of absence did not begin August 2006 when he moved to Baltimore.

have full professional certification signed a similar BCPS employment contract. BCPS assigned petitioner to teach sixth grade mathematics at Diggs-Johnson Middle School (Diggs-Johnson).

The BCPS employment contract required teachers to take the Praxis I and II tests, which are part of the teacher certification process that many States require, including Maryland. Petitioner completed the Praxis I test in late 2006 and the Praxis II in 2007. Petitioner received a Maryland education certificate in 2007, valid from July 1, 2005, through June 30, 2010.

Working in the United States provided petitioner with a salary that was considerably greater than what she had earned in the Philippines. Petitioner had earned approximately 10,000 Filipino pesos a month teaching in the Philippines, equivalent to $179 per month or $2,148 per year. Petitioner's annual salary for her first year of teaching for BCPS was $37,157, which increased to $51,263 and $58,262 for her second and third years, respectively.

With respect to Federal income tax withholding, petitioner did not provide BCPS with Form 8233, Exemption From Withholding on Compensation for Independent (and Certain Dependent) Personal Services of a Nonresident Alien Individual. Consequently, BCPS withheld Federal income tax from petitioner's salary during 2005, 2006, and 2007.

Petitioner engaged professional tax preparers to prepare her 2005, 2006, and 2007 Federal income tax returns.[4]  For 2005 and 2006 petitioner filed Forms 1040NR, U.S. Nonresident Alien Income Tax Return.  For 2007 she filed Form 1040, U.S. Individual Income Tax Return.  Petitioner reported that her salary from BCPS for the 2005 and 2006 calendar years was exempt from taxation in the United States under article 21.  Petitioner included all of her earnings from BCPS for 2007 on her 2007 Federal income tax return.  In her amended petition, however, she contended that the first 6 months of her 2007 earnings from BCPS were also exempt from Federal income tax under the 2-year exclusion of article 21.

Petitioner claimed total itemized deductions of $25,636 for 2006.  This amount consisted of $4,152 for State and local taxes, $175 for charitable contributions, $21,259 for unreimbursed employee expenses, and $50 for tax preparation fees.  She claimed no deductions for 2005, and she claimed the $7,850 head of household standard deduction for 2007.  As a result of the income exclusion, income tax withholding, and deductions, petitioner requested refunds for each year 2005 through 2007.

Petitioner returned to the Philippines on June 9, 2008, before her J-1 visa expired on June 27, 2008.  She applied for

---

[4]In the affidavit, petitioner states that Fred Pacheco prepared all of the returns at issue.  At trial, she testified that Mr. Pacheco prepared the 2005 and 2006 returns and that Martha Newby prepared the 2007 return.

and obtained an H-1B visa valid from July 14, 2008, through June 20, 2010.  Petitioner was subsequently granted another H-1B visa valid from October 1, 2009, through September 30, 2012.  She returned to the United States, and as of the date of trial, she continued to be employed by BCPS.

The Internal Revenue Service (IRS) selected petitioner's 2005, 2006, and 2007 Federal income tax returns for examination. The examining agent sent three questionnaires to petitioner: Form 8784, Questionnaire - Temporary Living Expenses; Form 9210, Alien Status Questionnaire; and Form 9250, Questionnaire - Tax Treaty Benefits.  Petitioner completed the forms, dated her signature September 20, 2008, and returned the forms to the IRS.

The Court received into evidence copies of the three questionnaires that petitioner had completed.  On Forms 8784 and 9210 petitioner wrote that June 22, 2005, was her date of initial arrival and that at that time she expected to remain in the United States for 3 years.  She answered the next question on both forms indicating that she revised and renewed her visa status so that she could stay in the United States for another 3 years.

In the notice of deficiency dated March 23, 2009, the IRS adjusted petitioner's income to include the earnings from BCPS for 2005 and 2006 that petitioner had excluded under article 21. In addition, the IRS disallowed the total amount of $21,259

deducted as unreimbursed employee expenses for 2006. The $21,259 consisted of $9,150 for rent, $500 for home furnishings, $1,320 for transportation costs, $1,368 for household insurance, $2,500 for meals, $200 for school supplies, and $6,221 for job search expenses. The $21,259 amount was categorized as "job search costs" on petitioner's 2006 Schedule A, Itemized Deductions. Petitioner filed her petition contesting all of respondent's adjustments.

Respondent moved under Rule 121 for partial summary judgment concerning the issue of whether petitioner qualified in the years at issue for the exemption under article 21. Petitioner objected to the granting of the motion. The issue was fully briefed by both parties. The motion was set for hearing at trial. When the case was called for trial, the motion was heard. The parties relied on their respective positions set forth in their briefs. The motion for partial summary judgment has been denied.

The case was then tried, and the Court heard testimony from petitioner, Mr. Duque, and Ms. Hermann. The Court also received into evidence a form BCPS completed for Amity entitled "Addendum to Amity Confirmation of Employment Form 2007/2008" (the addendum). Mr. Duque signed and dated the form July 1, 2007. The addendum showed that BCPS had retained 170 of the 178 (95.5 percent) Filipino teachers in the past 2 years who had taught for BCPS through Amity's exchange teacher program.

## Discussion

### I.  Income Under Article 21

Petitioner was a nonresident alien for the years at issue because of her J-1 visa status and her participation in the exchange teacher program.  See sec. 7701(b).  In particular, section 7701(b)(1)(B) provides that a nonresident alien is a person who is not a citizen or resident of the United States within the meaning of section 7701(b)(1)(A).[5]  Generally, a nonresident alien individual engaged in trade or business within the United States is taxed on the taxable income effectively connected with that trade or business.  Sec. 871(b).  The phrase "trade or business within the United States" generally includes the performance of personal services within the United States at any time within the taxable year.  Sec. 864(b).  Compensation paid to a nonresident alien in exchange for the performance of services in the United States constitutes income that is effectively connected with the conduct of trade or business in the United States.  Sec. 1.864-4(c)(6)(ii), Income Tax Regs. Consequently, petitioner's wages would ordinarily be included in gross income under the Code.  Section 894(a), however, provides that the provisions of the Code will be applied to any taxpayer

---

[5]As a teacher, petitioner is considered an exempt individual, and, therefore, not treated as present for purposes of the substantial presence test.  See sec. 7701(b)(1)(A)(ii), (3)(D)(i), (5)(A)(ii).

with due regard to any treaty obligations of the United States that apply to the taxpayer.  Therefore, the treatment of petitioner's wages might be altered by applicable treaty provisions.  See id.

The United States is a party to an income tax convention with the Republic of the Philippines.  The convention provides an exemption from U.S. income taxation on income earned by Filipino teachers teaching in the United States if the requirements of the convention are satisfied.  Article 21 states:

### Article 21
#### TEACHERS

(1) Where a resident of one of the Contracting States is invited by the Government of the other Contracting State, a political subdivision or local authority thereof, or by a university or other recognized educational institution in that other Contracting State to come to that other Contracting State for a period not expected to exceed 2 years for the purpose of teaching or engaging in research, or both, at a university or other recognized educational institution and such resident comes to that other Contracting State primarily for such purpose, his income from personal services for teaching or research at such university or educational institution shall be exempt from tax by that other Contracting State for a period not exceeding 2 years from the date of his arrival in that other Contracting State.

To qualify for the exemption under article 21, a taxpayer must meet the following requirements:  (1) The taxpayer was a resident of the Philippines before coming to the United States; (2) she was invited by the Government or a recognized educational institution within the United States; (3)  she was invited for a

period not expected to exceed 2 years; (4) the purpose of the invitation was for her to teach or engage in research at the recognized educational institution; and (5) she did in fact come to the United States primarily to carry out the purpose of the invitation. All of the requirements of article 21 must be satisfied in order for petitioner to qualify for the income exemption. The only requirement in dispute is whether petitioner's invitation to teach in the United States was "for a period not expected to exceed 2 years".

The text of article 21 does not specifically state whose expectation controls the length of the invitation to teach for a period not to exceed 2 years. Petitioner argues that her expectation as the invitee is the only expectation that matters. Respondent counters that either the expectation of the invitor, BCPS, should be decisive, or the Court should weigh the expectations of all the parties associated with the exchange teacher program. In the light of this ambiguity in the text of article 21, we will consider all the relevant facts and circumstances, including the expectations of all the parties. See Santos v. Commissioner, 135 T.C. __, __ (2010) (slip op. at 17). We will construe the language of the treaty liberally. See N.W. Life Assurance Co. of Can. v. Commissioner, 107 T.C. 363, 378 (1996). Then we will make an objective determination of whether petitioner was invited to the United States "for a period

not expected to exceed 2 years". See <u>Santos v. Commissioner</u>, <u>supra</u>.

A. <u>Burden of Proof</u>

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the deficiency is incorrect. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Furthermore, any deductions allowed are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to them. Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).

Under section 7491(a) the burden may shift to the Commissioner regarding factual matters affecting a taxpayer's liability for tax if the taxpayer produces credible evidence and meets other requirements of the section. Petitioner moved for a burden shift under section 7491(a), contending that she produced credible evidence and met the other requirements of the section. Respondent objected, contending that "petitioner has failed to introduce credible evidence to support her assertion that her stay in the United States was expected to last 2 years or less." We need not, and we explicitly do not, decide which party bears the burden of proof because as discussed above, applying <u>Santos v. Commissioner</u>, <u>supra</u>, we will decide this case on an objective consideration of all the relevant facts and circumstances.

B.  Analysis

We begin our analysis with a discussion of the evidence that relates to petitioner's expectation.  Petitioner's reliance on the apartment leases and the 1-year BCPS employment contract is unconvincing.  One-year apartment leases are commonplace and do little to indicate a tenant's long-term expectation to remain in an area.  Moreover, petitioner resided in her first apartment for a year and 1 month.  Her family moved to Baltimore in August 2006, at or about the time she signed her second apartment lease, which was for 1 year.  Thus petitioner's two leases covered a period of more than 2 years.

Likewise, BCPS required all of its first-year teachers to sign what amounts to a standard 1-year employment contract.  The fact that the contract did not guarantee employment beyond the first year does not mean that petitioner expected to stay in the United States for only 1 year.  Amity had informed petitioner that so long as her performance was satisfactory, BCPS would retain her.  Petitioner testified that she expected to receive a satisfactory evaluation from BCPS.  We believe that petitioner could reasonably expect that BCPS would employ her for the second and third years and perhaps beyond.  In fact, petitioner did receive a satisfactory evaluation at the end of the 2005-2006 school year, and petitioner's family moved to Baltimore to reside with her.

More persuasive are petitioner's own words in her answers on the three IRS questionnaires. Her answers indicate that her initial expectation was to remain in the United States for the entire length of the J-1 visa and the entire length of the 3-year exchange teacher program. In response to this evidence against her, petitioner testified that she did not have any help filling out the forms and that no one explained the forms to her. Although this may be true, petitioner's testimony does little to support her argument because she has a master's degree in educational administration, she speaks fluent English, and the questions on the forms are straightforward, not requiring any technical knowledge.

Furthermore, petitioner introduced no evidence that she expressed to any of the parties involved that she expected to return to the Philippines within her first 2 years in the United States. Similarly, petitioner did not testify at trial that she expected to return home within the first 2 years. Instead, she stated that she determined her expectation regarding the length of her stay on a "year-to-year" evaluation of her situation.

It is important to note that one goal of the exchange teacher program was for the exchange teacher to share her experiences in the United States with Filipino students when the teacher returned to the Philippines at the conclusion of the exchange program. When questioned about this goal, petitioner

testified that she wanted to share what she learned in the United States with Filipino students "if I had a chance to". Petitioner's testimony bolsters the argument that she expected to be in the United States for as long as she could legally stay in the country and that she had no expectation of returning to the Philippines within 2 years.

We also find it highly significant that despite the fact that petitioner stated that she enjoyed teaching in the Philippines more than in the United States, she remained in Baltimore teaching at Diggs-Johnson and as of the date of trial continued to work for BCPS. Petitioner's actions indicate a strong commitment to staying in the United States. The fact that petitioner did not renew her leave of absence in the Philippines, while not a decisive factor, also weighs against her argument.

In addition, we cannot ignore the financial incentive of remaining in the United States for as long as possible. Petitioner incurred more than $8,000 in expenses to participate in the exchange teacher program and to relocate to the United States. We also cannot ignore the fact that petitioner inquired into the process for bringing her family to the United States before she started teaching and then spent a substantial amount of money to move her family to Baltimore in 2006. The money petitioner spent to move herself and her entire family to Baltimore is not an insignificant sum in comparison to her

earnings in the Philippines.  Moreover, her earnings immediately grew seventeenfold from $2,148 to $37,157 when she moved from the Philippines to the United States.  Further, her earnings of $58,262 in 2007, which was her third year at BCPS were, 57 percent greater than her first-year salary.

From the perspective of BCPS, the school system certainly would not have invested so much time, money, and effort in recruiting teachers from the Philippines if it did not expect that the teachers would remain at least for the length of the 3-year exchange teacher program.  Mr. Duque likewise testified that BCPS wanted to retain the teachers it hired for as long as possible.  Corroborating this testimony is the evidence from the addendum showing that BCPS retained an extremely high percentage, 95.5 percent, of the Filipino teachers it hired through the exchange program.  Additionally, Ms. Hermann testified that BCPS, similar to the other school systems that hired foreign teachers through the exchange program, expected the teachers to stay for the entire 3-year program.  She added that it had been Amity's experience that only a small percentage of Filipino teachers returned to the Philippines before completing the 3-year exchange teacher program and that most of participants decided to remain in the United States beyond the 3 years.  The testimony of these witnesses is plausible, reliable, and persuasive.

In conclusion, after an objective examination of all of the relevant facts and circumstances, we find that petitioner and BCPS expected petitioner to stay in the United States for at least 3 years, which is longer than the "not expected to exceed 2 years" requirement of article 21. Therefore, petitioner's income for June 2005 to June 2007, the first 2 years she was in the United States, is not exempt from Federal income tax under article 21.

II. 2006 Disallowed Unreimbursed Employee Expenses--$21,259

Section 162(a) allows a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. The performance of services as an employee is considered a trade or business for section 162 purposes. Primuth v. Commissioner, 54 T.C. 374, 377 (1970). For an expense to be necessary, it must be "appropriate and helpful" to the taxpayer's business. Welch v. Helvering, 290 U.S. at 113-114. An expense will be considered ordinary if it is a common or frequent occurrence in the type of business in which the taxpayer is involved. Deputy v. du Pont, 308 U.S. 488, 495 (1940). In order to deduct a business expense, a taxpayer must not have received reimbursement and must not have had the right to obtain reimbursement from his employer. Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986), affg. T.C. Memo. 1984-533; Leamy v. Commissioner, 85 T.C. 798, 810 (1985).

A.  Job Search Costs and School Supplies--$6,421

Included in the disallowed unreimbursed employee expenses is $6,221 for job search costs and $200 for school supplies. Petitioner's $6,221 for job search costs is a combination of expenses she paid in 2005 and 2006.  She paid $5,200 for her J-1 visa and $382 for classes and fees in the Philippines as a prerequisite to teach for BCPS in 2005.  Petitioner substantiated these amounts and is entitled to a deduction for those amounts in 2005.

Petitioner paid $750 for the exchange program fee and $50 for fingerprinting in 2006.  The exchange program fee was $3,000. BCPS paid $1,500 of the fee during petitioner's first year of the program.  Petitioner was responsible for the two subsequent annual payments of $750, one made in the second year of the program and one in the third.  Petitioner had to pay the fee to continue her participation in the exchange program.  Petitioner did not substantiate her $750 payment in 2006, but we are satisfied that petitioner paid a fee of $750 in 2006 to maintain her standing in the program.  Petitioner did substantiate the $50 fee she paid for fingerprinting.  Therefore, petitioner is entitled to a deduction in those amounts for 2006.

Petitioner deducted $200 for school supplies.  She provided receipts for $106 worth of school supplies purchased in 2005. Petitioner provided no receipts for any amounts spent for school

supplies in 2006.  The proper year for the deduction for school supplies is 2005.  We are satisfied that petitioner spent $106 for school supplies in 2005 and was not reimbursed by BCPS. Therefore, petitioner is entitled to a deduction of $106 for school supplies for 2005.  See sec. 62(a)(2)(D) (certain expenses of elementary and secondary school teachers are deductible to determine adjusted gross income).

B.  <u>Personal Living and Commuting Expenses--$13,470</u>

Respondent also disallowed unreimbursed employee expenses consisting of $9,150 for rent, $2,500 for meals, $500 for furniture rental or home furnishings, and $1,320 for commuting between her apartment and her teaching job at Diggs-Johnson.  As a general rule, personal living expenses are nondeductible.  Sec. 262; secs. 1.162-2(a), 1.262-1(b)(5), Income Tax Regs.  Section 162(a)(2), however, allows a taxpayer to deduct ordinary and necessary travel expenses, including meals and lodging, paid or incurred while away from home in pursuit of a trade or business. <u>Commissioner v. Flowers</u>, 326 U.S. 465, 470 (1946).

The reference to "home" in section 162(a)(2) means the taxpayer's "tax home".  <u>Mitchell v. Commissioner</u>, 74 T.C. 578, 581 (1980); <u>Kroll v. Commissioner</u>, 49 T.C. 557, 561-562 (1968). As a general rule, a taxpayer's tax home is in the vicinity of his principal place of employment, not where his personal residence is located, if different from his principal place of

employment.  Mitchell v. Commissioner, supra at 581; Kroll v.
Commissioner, supra at 561-562.  An exception to the general rule
exists where a taxpayer accepts temporary, rather than
indefinite, employment away from his personal residence; in that
case, the taxpayer's personal residence may be his tax home.
Peurifoy v. Commissioner, 358 U.S. 59, 60 (1958).  The purpose of
the exception is to mitigate the burden of the taxpayer who must
incur duplicate living expenses due to the exigencies of
business.  Kroll v. Commissioner, supra at 562.  For purposes of
section 162(a)(2), the taxpayer is not treated as being
temporarily away from home if the period of employment exceeds 1
year.  Sec. 162(a) (flush language).

Petitioner contends that her employment with BCPS was
temporary because the BCPS employment contract she signed was for
only 1 year.  She contends that her tax home was in the
Philippines, as that was where she resided with her family.  In
other words, according to petitioner, her rent, home furnishings,
and commuting expenses for 2006 are deductible because she
expected to stay in the United States for no more than a year,
the length of the BCPS employment contract, and thus, her job was
temporary.

Respondent argues that petitioner's employment at BCPS was
indefinite and that Baltimore became her tax home when she moved

there to teach beginning August 2005 for BCPS.  For the following reasons, we agree with respondent.

Petitioner took a 1-year leave of absence from her teaching job in the Philippines when she moved to Baltimore on June 22, 2005.  She began teaching at Diggs-Johnson for BCPS in August 2005.  We have already found that petitioner intended to remain in the Baltimore area for at least 3 years to work for BCPS, which is clearly more than 1 year.  Although petitioner testified to owning property in the Philippines, she provided no evidence of duplicate living expenses.  Accordingly, Baltimore was petitioner's principal place of employment and thus Baltimore was her tax home.  Moreover, petitioner's employment at BCPS was for more than 1 year and, therefore, not temporary.  Consequently, petitioner is not entitled to claim a deduction for her rent, meals, home furnishings, or commuting expenses for 2006.

C.  Household Insurance--$1,368

Finally, respondent disallowed an unreimbursed employee expense of $1,368 for "household insurance".  The total amount in dispute is actually for health insurance.  Generally, health insurance premiums are a medical expense deductible as an itemized deduction to the extent they exceed 7.5 percent of adjusted gross income.  Sec. 213(a), (d)(1)(D); Kirsch v. Commissioner, T.C. Memo. 1995-451.  Petitioner provided evidence that she paid health insurance premiums of $36 in 2005, $36 in

2006, and $180 in 2007.  Petitioner has substantiated these amounts, and she is entitled to a deduction of $36 for 2005 and $36 for 2006 if the requirements of section 213 are met. Although petitioner also substantiated the $180 she paid in 2007, she did not itemize her deductions that year, claiming instead the standard deduction for a head of household.

III.  Accuracy-Related Penalty

Taxpayers may be liable for a 20-percent penalty on the portion of an underpayment of tax attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax.  Sec. 6662(a) and (b)(1) and (2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code, and the term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances.  See Allen v. Commissioner, 92 T.C. 1, 12 (1989), affd. 925 F.2d 348, 353 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  An "understatement of income tax" is substantial if it exceeds the

greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

The section 6662 accuracy-related penalty does not apply where the taxpayer shows that he or she acted in good faith and exercised reasonable cause.  Sec. 6664(c)(1).  The determination of whether a taxpayer acted in good faith and with reasonable cause depends on the facts and circumstances of each case and includes the knowledge and experience of the taxpayer and the reliance on the advice of a professional, such as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.  For a taxpayer to rely reasonably upon advice of a tax adviser, the taxpayer must, at a minimum, prove by a preponderance of the evidence that:  (1) The adviser was a competent professional with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).  Most important in this determination is the extent of the taxpayer's effort to determine the proper tax liability.  Id.

The Commissioner has the burden of production under section 7491(c), with respect to the accuracy-related penalty under section 6662.  To satisfy that burden, the Commissioner must produce sufficient evidence showing that it is appropriate to

impose the penalty.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Respondent has satisfied his burden by producing evidence that petitioner reported no income for 2005, 2006, and part of 2007, failed to substantiate claimed deductions, and had a substantial understatement of income tax for 2006.

Nonetheless, petitioner sought the advice of one return preparer for her 2005 and 2006 Forms 1040NR and a different preparer for her 2007 Form 1040.  Petitioner stated that her preparer for 2005 and 2006 was an accountant in the Philippines and an enrolled agent in the United States.  Respondent did not dispute the competency of either preparer.  The preparer of the Forms 1040NR counseled petitioner that her income was exempt from taxation in the United States under article 21.  Petitioner, having no formal training in taxation and being new to the U.S. tax system, reasonably relied upon the advice of a competent tax preparer and acted in good faith.  Respondent's adjustments for 2007 were minor, and again, petitioner engaged a competent preparer to prepare her 2007 Federal income tax return.  Therefore, we do not sustain respondent's determination that the section 6662 accuracy-related penalty applies for 2005, 2006, or 2007.

IV.  <u>Conclusion</u>

The Court has considered all arguments made in reaching our decision, and to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.